# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Michael Jordan, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Dominick's Finer Foods, *et al.*,<br><br>Defendants. | Case No. 10 C 407<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

Before the Court are: (1) Plaintiff's Motion to exclude opinion of Rodney Fort [281]; (2) Defendants' Motion *in Limine* No. 12 to exclude the expert testimony of Andrew Zimbalist [278]; (3) Plaintiff's motion to exclude evidence of cease and desist letters [205]; (4) Plaintiff's motion to exclude evidence of what Defendants would have paid to use his identity [206]; (5) Defendants' Motions *in Limine* 2-5, 7, 10-11, 13 and 15 [210]; and (6) Defendants' Motion *in Limine* No. 1 [211].  Each motion will be addressed in turn below.

## I.      Background

In 2009, Sports Illustrated produced a commemorative issue honoring former Chicago Bull, Birmingham Baron and "Space Jam" star Michael Jordan's induction into the Hall of Fame.  The issue was titled Jordan: "Celebrating a Hall of Fame Career."  It was not distributed to the magazine's regular subscribers; instead, it was made available only in participating retail stores, with the target markets

being the Chicago area and some parts of North Carolina. Although Sports Illustrated has approximately three million subscribers, it only produced 140,820 copies of this commemorative issue, and only 41,513 copies were sold.

Sports Illustrated offered Safeway – a supermarket conglomerate and owner of the now defunct Dominick's supermarket chain in Chicago – a free one-page ad in the commemorative issue in exchange for, among other things, premium floor space at its Dominick's locations for the display and sale of the magazine. Safeway agreed. The ad in question featured a basketball jersey at the top that read "Michael Jordan" and included the number 23 (*i.e.*, the number Jordan wore as a player). In the center of the ad it said "YOU ARE A CUT ABOVE," and below that there was a photograph of a Rancher's Reserve tender angus steak, and a $2.00 coupon for a Rancher's Reserve steak at any Dominick's location. Safeway reports that only two coupons were redeemed.

Jordan sued Safeway and Dominick's for their unlicensed use of his persona. In an oral ruling, Judge Milton I. Shadur granted in part Jordan's motion for summary judgment, holding that Safeway violated the Illinois Right of Publicity Act, 765 ILCS 1075/40 ("IRPA"), by misappropriating Jordan's identity, and Jordan voluntarily withdrew his remaining claims against Defendants [126]. On June 20, 2014, this case was reassigned from Judge Shadur to Judge Robert M. Dow, Jr., and on January 27, 2015 it was reassigned to this Court. The parties are now in preparation for a trial on damages only, currently set to begin on August 11, 2015. [297].

A hearing was held on May 19, 2015, regarding all of the currently pending motions. At that hearing, it became apparent that determining the proper manner of calculating "actual damages" under the IRPA remains the principal issue in the case. Under that Act, the Plaintiff is entitled to "actual damages, profits derived from the unauthorized use, or both." 765 ILCS 1075/40. In support of their respective cases, the parties have proposed conflicting tests for actual damages under the IRPA, with each party naturally relying upon the data points that are most favorable to their own position. It is those tests and data points that are disputed in the currently pending motions. Because the issue of damages underlies all of the motions, the Court will first consider the appropriate calculation of actual damages under the IRPA, and then discuss each motion separately.

## II.     Damages under the Illinois Right of Publicity Act

The meaning of "actual damages" under the IRPA presents a question of statutory interpretation of an Illinois law. More specifically, the question for the Court is how to instruct the jury regarding the meaning of "actual damages" under the IRPA. When applying or interpreting Illinois state law while sitting in supplemental jurisdiction, the Court is required to make its best prediction of how the Illinois Supreme Court would decide the issue. *Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 925 (7th Cir. 2002). If the state supreme court has not spoken on a particular issue, then decisions of the intermediate appellate courts will control "unless there are persuasive indications that the state supreme court would decide the issue differently." *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d

1087, 1090 (7th Cir. 1999). Finally, if there are no directly applicable state decisions at all, then the Court may consult "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data" that might be persuasive on the question of how the state supreme court would likely rule. *See Pisciotta v. Old Nat'l Bancorp.*, 499 F.3d 629, 635 (7th Cir. 2007) (citations and quotation omitted). In this case, even though the Illinois state courts have not provided any specific guidance on the meaning of actual damages under the IRPA, they have provided a rubric for the interpretation of the statute.

### a. Statutory Interpretation

The fundamental rule of statutory construction requires courts to determine and give effect to the legislature's intent. *General Motors Corp. v. Pappas*, 242 Ill.2d 163, 180 (2011).[1] The statutory language, given its plain and ordinary meaning, best indicates the legislature's intent. *Id*. When the statutory language is clear and unambiguous, a court must give effect to the statute's plain meaning without resorting to extrinsic statutory-construction aids. *Id*. Here, the term "actual damages" is not defined by the statute itself, nor is it defined by any applicable case law interpreting the statute.

In such an instance, it is "appropriate to employ a dictionary to ascertain the meaning of an otherwise undefined word or phrase." *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 8 (2009). In fact, the Illinois Courts of Appeal have previously relied

---

[1] Because this concerns the construction of an Illinois statute, we follow the statutory construction principles of Illinois state law. *In re Crane*, 742 F.3d 702, 707 (7th Cir. 2013).

on Black's Law Dictionary to define "actual damages" where it was undefined by statute.  *See Smith, Allen, Mendenhall, Emons & Selby v. Thomson Corp.*, 862 N.E.2d 1006, 1009 (Ill. App. Ct. 2006).  Black's Law Dictionary defines "actual damages" as an "amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses – also termed compensatory damages; tangible damages; real damages."  DAMAGES, Black's Law Dictionary (10th ed. 2014).  While this definition explains what actual damages are generally, it does not explain what they are specifically for the infringement of the right of publicity.  The phrase therefore requires additional interpretation.

Where a statute requires interpretation and the exact legislative intent cannot be ascertained from the plain and ordinary meaning of its language alone, the court is guided by statutory history and the rules of statutory construction. *People v. Holm*, 22 N.E.3d 1269, 1272 (Ill. App. Ct. 2014).  Generally, the interpretation of a statute must be grounded on the nature and object of the statute, as well as the consequences which would result from construing it one way or another.  *Andrews v. Foxworthy*, 373 N.E.2d 1332, 1335-36 (Ill. 1978).  Legislative intent may be ascertained from the reason and necessity for the act, the evils sought to be remedied, and the objects and purposes sought to be obtained.  *In re Marriage of Antonich*, 499 N.E.2d 654, 656 (Ill. App. Ct. 1986).  In short, the statutory "text" must be placed within its "context" to be properly understood.

Unfortunately, in this instance, there is no relevant statutory history, and the other canons of statutory interpretation provide no meaningful guidance on the

definition of actual damages for cases involving the right of publicity. The Court thus turns to "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data." *Pisciotta*, 499 F.3d at 635.

### b. Other Authority

Under Illinois Supreme Court Rule 239, whenever the civil version of the Illinois Pattern Jury Instructions ("IPI"), "contains an instruction applicable in a civil case," and the court determines, "giving due consideration to the facts and the prevailing law," that the jury "should be instructed on the subject," then the "IPI instruction shall be used, unless the court determines that it does not accurately state the law . . ." IL R S CT Rule 239. Furthermore, whenever the "IPI does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given in that subject should be simple, brief, impartial, and free from argument." *Id*. Finally, in choosing the appropriate instruction to give, it is proper to consider IPI instructions for similar actions. *See Sanchez v. Black Bros. Co.*, 423 N.E.2d 1309, 1320 (Ill. App. Ct. 1981); *Schutt v. Terminal R. R. Ass'n of St. Louis*, 223 N.E.2d 264, 268 (Ill. App. Ct. 1967).

Here, while the IPI do not contain an instruction for actual damages under the IRPA, important guidance can be found in a number of related instructions concerning compensatory damages. Instruction 30.01 concerns the measure of damages to property and reads as follows:

> If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate

him for any of the following elements of damages proved by the evidence to have resulted from the wrongful conduct of the defendant.

[Here insert the elements of damages which have a basis in the evidence]

Whether any of these elements of damages has been proved by the evidence is for you to determine.

IPI 30.01. The general instruction requires that the Court insert the relevant elements of damages into the bracketed section in the middle of the instruction. While there is no IPI instruction for damages under the IRPA as noted above, Illinois case law does provide for the elements of damages in a closely analogous context – civil conversion.

The elements of conversion are: (1) the unauthorized and wrongful assumption of control or ownership by one person over the personalty of another; (2) the other person's right in the property; (3) the right to immediate possession of the property; and (4) a demand for possession. *Stevens v. Newman*, No. 5-13-0338, 2015 WL 1774798, at *9 (Ill. App. Ct. 2015). This compares favorably with the action here because the right of publicity is essentially a property right under the IRPA, *Ainsworth v. Century Supply Co.*, 693 N.E.2d 510, 514 (Ill. 1998), and the Defendant here has wrongfully assumed control of that right.

Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion, plus legal interest. *Jensen v. Chicago & Western Indiana R.R. Co.*, 419 N.E.2d 578, 593 (Ill. App. Ct. 1981). It is the plaintiff's burden to show a reasonable basis to determine the value of items

converted. *Long v. Arthur Rubloff & Co.,* 327 N.E.2d 346, 355 (Ill. App. Ct. 1975). The evidence must "afford some reasonable and proper basis for ascertaining value," and at "a minimum, it must rise to the dignity of proof, and supply such elements or standards for measuring value to enable the trier of fact to exercise its judgment." *Id.* Under long-standing precedent, the Illinois courts do not restrict the manner in which the fair market value of the property should be computed, *id.*, provided that damages may "not be predicated on mere speculation, hypothesis, conjecture or whim" but instead must be based on any evidence that shows "a basis for the computation of damages with a fair degree of probability." *Application of Busse*, 464 N.E.2d 651, 655 (Ill. App. Ct. 1984).

In light of the above authority, it is apparent that the actual damages for Plaintiff's infringed right of publicity under the IRPA can be proven in more than one manner, provided the factual method of proof satisfies two legal criteria: (1) the method must be based on the fair market value of the infringing use at the time of the infringement, plus interest; and (2) the method must not be predicated on mere speculation or conjecture.

As such, given the circumstances in this case, the Court finds that the following jury instruction properly defines "actual damages" under the IRPA:

> If you decide for the plaintiff on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damages proved by the evidence to have resulted from the wrongful conduct of the defendant:

> Plaintiff's actual damages, which are the fair market value of the infringing use of Plaintiff's identity at the time of the infringement, plus interest.

> It is the plaintiff's burden to show a reasonable basis to determine the value, and the method of proving this value may not be based on mere speculation or conjecture.

> The factual basis may include evidence of past transactions showing the value of comparable uses, including past transactions that were proposed or negotiated but never finalized.

> Whether these damages have been proved by the evidence is for you to determine.

This Court's reading of the IRPA falls in line with the approach taken by federal courts and commentators throughout the country within the right to publicity context. "The measure of damage in a case of infringement of the right of publicity focuses upon the commercial injury to plaintiff. The most obvious measure of damage is an award of the fair market value of the property right in plaintiff's identity which defendant has used without permission." 2 Rights of Publicity and Privacy § 11:30 (2d ed). For "celebrities," such a market value "can be ascertained relatively easily by expert testimony as to comparables: amounts received by comparable persons for comparable uses. An expert is permitted to testify as to his opinion about the fair market licensing value of plaintiff's identity for the kind of usage made by defendant." 2 Rights of Publicity and Privacy § 11:32 (2d ed). In fact, courts routinely rely on a calculation based upon the value of the infringing use at the time of that use. *See Bogart, LLC v. Ashley Furniture Indus., Inc.*, No. 3:10-CV-39 CDL, 2012 WL 3745833, at *1 (M.D. Ga. Aug. 28, 2012); *Ventura v. Titan*

*Sports, Inc.*, 65 F.3d 725 (8th Cir. 1995); *Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089, 1103 (D. Ariz. 2006); *Capdeboscq v. Francis*, No. CIV.A. 03-0556, 2004 WL 1418392, at *2 (E.D. La. June 23, 2004); *Apple Corps Ltd. v. Leber*, 1986 WL 215081 (Cal. App. Dep't Super. Ct. 1986). However, the estimate "of the marketplace or licensing value of a celebrity identity cannot be based upon speculation or conjecture and must be supported by reasonable assumptions and comparables." 2 Rights of Publicity and Privacy § 11:32 (2d ed).

Finally, this Court's instruction not only constitutes a proper reading of the statutory text under Illinois law, but it also remains consistent with the methods of proof proposed by the parties themselves. While the parties hotly dispute the methods used by their competing experts, particularly the use of the hypothetical negotiation, it appears that the various methods are, in fact, all based upon evidence of prior transactions for the use of identity that are (to varying degrees) comparable. In a real way, it is not the definition of actual damages, therefore, that is in dispute; but rather which data points should form the method of computing that fair market value. Which data points are "comparable" for the purposes of the fair market value computation is governed in part by the Court's rulings on the pending motions *in Limine* set out below. Ultimately, however, the key decision-making with regard to which data points are, in fact, "comparable" will be done by the jury.

Having established the legal meaning of "actual damages," the Court now considers the parties' *Daubert* motions.

10

### III.  *Daubert* Motions

Both Plaintiff and Defendant have disclosed damages experts opining on the fair market value of Plaintiff's identity.  On March 15, 2013, Plaintiff disclosed the opinion of Andrew Zimbalist, a Professor in the Department of Economics at Smith College, who valued Plaintiff's identity in excess of $10 million.  On September 20, 2013, Defendant disclosed the opinion of Rodney Fort, Professor of Sport Management in the School of Kinesiology at the University of Michigan, who concluded that the fair market value of Plaintiff's persona as used by Defendant is, at most, $126,900.  Fort also attacked Zimbalist's opinion as unreliable, and in a supplemental report issued on November 12, 2013, Zimbalist returned the favor. Each side contests the admissibility of their counterpart's proffered expert.  While these motions are styled differently, it is apparent from their face that each is appropriately considered as a *Daubert* motion.

### a.  Legal Standard

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011); *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Rule 702 requires that the district court act as a "'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741–42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v.*

*Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Daubert*, 509 U.S. at 589.

In reviewing a motion to exclude testimony under Rule 702, the district court must "ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Bielskis*, 663 F.3d at 893-94 (quoting Fed. R. Evid. 702); *see also Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (outlining the "three-step analysis" for assessing the admissibility of expert testimony). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997) (holding that abuse of discretion standard applies in reviewing district court rulings on admissibility of proposed Rule 702 opinion testimony).

*Daubert* lists a number of relevant considerations in evaluating an expert's reasoning and methodology, including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert* 509 U.S. at 593–94. "[T]he test of reliability is flexible," however, "and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141 (internal quotation omitted). "Rather the law grants a district court

the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142 (emphasis omitted); *see also Pansier*, 576 F.3d at 737 (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only how to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable" (emphasis omitted) (citing *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir. 2007))); *Lewis*, 561 F.3d at 704–05 ("[T]he law grants the district court great discretion regarding the manner in which it conducts that [*Daubert*] evaluation." (citation omitted)).

In assessing the admissibility of proposed expert testimony, the Court's "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. As the Supreme Court has recognized, however, "conclusions and methodology are not entirely distinct from one another," and while trained experts "commonly extrapolate" from existing data, nothing in "either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec.*, 522 U.S. at 146. In other words, an "expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791–92 (7th Cir. 2008) (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)). In short, it is "critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is

13

intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

Where that link is missing, a "court may conclude that there is simply too great an

analytical gap between the data and the opinion proffered." *Gen. Elec.*, 522 U.S. at

146.

### b. Jordan's Motion to Exclude Safeway's Expert (Fort)

Plaintiff moves to exclude Fort's opinion on the grounds that: (1) his

methodology is incorrect as a matter of economics; (2) his methodology lacks legal

support; and (3) his methodology is not reliable as applied to the facts of this case.

Both parties agree that damages are limited to the fair market value of Defendant's

use of Plaintiff's identity,[2] but Plaintiff argues that the proper method for

measuring the fair market value of the use of a celebrity's identity is by reference to

"amounts received by comparable persons for comparable uses" or by looking to

"amounts the plaintiff has obtained from similar licensing programs." [187] at 5

(quoting 2 J. Thomas McCarthy, *The Rights of Publicity & Privacy* § 11:32 (2d ed.

2011)) (hereinafter "McCarthy"). Defendant, on the other hand, instructed Fort to

assume that the willing-buyer/willing-seller test (or the "hypothetical-negotiation

---

[2] While the parties agree that the correct measure of damages in this case is limited to the fair market value of the alleged misappropriation of identity, not all courts impose such a limitation. Compare *Clark v. Am. Online, Inc.*, at *8 (N.D. Cal. Nov. 30, 2000) (claiming that fair market value is the true measure of damages in right of identity cases), with *Lemon v. Harlem Globetrotters Intern., Inc.*, 437 F. Supp. 2d 1089, 1103 (D. Ariz. 2006) (noting that fair market value is only one way to measure damages in right of publicity cases, noting that disgorgement of profits is another method (citing Restatement (Third) of Unfair Competition § 49 cmt. d)). Nor is the Illinois Right of Publicity Act as limiting in its articulation of available damages. 765 ILCS 1075/40 ("A person who violates Section 30 of this Act may be liable for * * * actual damages, profits derived from the unauthorized use, or both.").

test")—as articulated in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)—is the appropriate framework for determining the fair market value of Defendant's use of Plaintiff's image.

### i. Whether Fort's Methodology Is Incorrect as a Matter of Economics

Plaintiff claims that Fort's hypothetical-negotiation test contravenes a fundamental economic principle, and thus the method is categorically unreliable. Fort considered both Plaintiff's (*i.e.*, the willing seller's) and Defendant's (*i.e.*, the willing buyer's) comparable transactions in formulating his opinion. Plaintiff disagrees with the latter half of this approach, arguing that the fair market value of a property right should not reflect the subjective value placed on that right by a particular buyer. Instead, Plaintiff claims that fair market value should only be "established by prior, arms-length transactions between a willing buyer and a willing seller," and not "the amount that the particular thief would have been willing to pay."

There are really two inquiries subsumed in Jordan's objection: (1) whether the hypothetical-negotiation test is a proper means of assessing fair market value in a right of publicity case; and, if so, (2) whether the hypothetical-negotiation test should take into account the subjective position of the defendant. As to the latter question, the parties fail to recognize a key distinction between (a) considering comparable transactions by both parties in a hypothetical negotiation, and (b) considering the parties' subjective willingness to enter into the particular

15

transaction at issue. Jordan accuses Fort of the latter when he is only guilty of the former.[3] As such, the Court only assesses the propriety of considering comparable transactions from both sides of the table in carrying out a hypothetical negotiation analysis.

As the Court has already explained, a proper computation of the fair market value of the infringing use may be based on evidence of prior transactions for comparable use. This is not limited to transactions by the Plaintiff only. Indeed, Defendant's approach here finds support in case law. Safeway relies on a copyright-infringement case where the Federal Circuit reversed the trial court for mishandling a hypothetical-negotiation analysis, holding that it is "incorrect in a hypothetical negotiation inquiry for a court to limit its analysis to only one side of the negotiating table." *Gaylord v. United States*, 678 F.3d 1339, 1343 (Fed. Cir. 2012). Interestingly, in that instance the trial court only considered the *defendant's* prior comparable transactions in its hypothetical negotiation, while ignoring evidence from the plaintiff's side that would have justified a higher damages award. *Id.* Regardless, in remanding the case, the appellate court instructed the trial court to "consider *all* evidence relevant to a hypothetical negotiation," as opposed to evidence from one side only. *Id.* at 1344. This holding is consistent with other

---

[3] Fort considered "observed market outcomes from Jordan's similar contracts" and "Safeway's actual advertising choices" to determine the parties' positions in his hypothetical-negotiation analysis (*i.e.*, Fort relied on objective data). While Fort's report does include rhetoric regarding Safeway's subjective outlook on advertising, Fort used that information to understand the position of the willing buyer in this context, and then relied only on Safeway's actual data in selecting comparable transactions.

applications of the hypothetical-negotiation test, albeit predominantly in the copyright and patent contexts (*i.e.*, not right-of-publicity cases). *See*, *e.g.*, *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990); *Ellipse Corp. v. Ford Motor Co.*, 461 F. Supp. 1354, 1379–80 (N.D. Ill. 1978). Fort's consideration of both parties in the application of his hypothetical-negotiation test aligns with these other similar applications, as well as this Court's legal instruction regarding the definition of actual damages, and thus his consideration of "both sides" is not a reason to exclude his testimony.

But Safeway offers little to address the primary inquiry, which is whether the hypothetical-negotiation test as articulated in *Georgia–Pacific* is proper in the right-of-publicity context in the first place. Nevertheless, in light of the Court's analysis above regarding the proper calculation of actual damages, the Court finds that the hypothetical-negotiation analysis performed by Mr. Fort is sufficiently reliable. In his opinion, Mr. Fort examined the value of the use of similar identities in similar prior transactions by both parties. While his test was explained as a "hypothetical-negotiation," it in reality hewed quiet closely to the jury instruction noted by the Court above. Because the analysis undertaken by Mr. Fort complies with the available factual methods for properly calculating actual damages under the IRPA, the Court finds that it was reliable here.[4]

---

[4] The Court notes Plaintiff's concerns about punishing Defendant for its unlawful use, deterring future violators, and protecting his right to use his identity when and how he chooses. Those concerns, however, are more appropriately addressed via punitive damages, which the Court has already found are inappropriate here.

### ii. Whether Fort's Methodology Lacks Legal Support

Jordan argues that Fort's opinion should be excluded because his applied method lacks legal support, both under the applicable statute and in case law. To the former, the Illinois Right of Publicity Act says that a victim is entitled to "actual damages, profits derived from the unauthorized use, or both," 765 ILCS 1075/40, and because Fort seeks to opine on Jordan's actual damages (as measured by fair market value), his opinion is not in contravention of the applicable statute.[5] *See*, *e.g.*, *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 566 (7th Cir. 2003) (considering fair market value in determining actual damages in a copyright infringement action); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (noting that if "actual damages" cannot be ascertained in a patent infringement, the royalty may be based "upon the supposed result of hypothetical negotiations between plaintiff and defendant"). Despite the fact that the Right of Publicity Act itself does not define "actual damages," the Court is persuaded that – as previously explained – Jordan's actual losses can be measured by the fair market value of his persona. Indeed, at least one court has endorsed the use of the hypothetical-negotiation test in a right-of-privacy case, *see Bogart*, 2012 WL 3745833, at *16–17, and Jordan has not pointed to any controlling authority—case

---

[5] Curiously, Jordan argues that Fort's hypothetical-negotiation method of assessing fair market value is improper under the Illinois Right of Publicity Act because the Act does not expressly mention the hypothetical-negotiation method as a means of measuring damages. But the Act does not mention the fair-market-value method as a means of measuring damages either, even though Jordan admits that this is the appropriate method for computing damages.

law or otherwise—suggesting that the use of this method is improper.[6] Furthermore, Fort's use of the hypothetical-negotiation test finds support in the policy considerations articulated by courts assessing "actual damages" in infringement cases:

> [T]he fair market value to be determined is not of the highest use for which plaintiff might license but the use the infringer made. Thus, assuming the defendant made infringing use of a Mickey Mouse image for a single performance of a school play before schoolchildren, teachers and parents with tickets at $3, the fair market value would not be the same as the fee customarily charged by the owner to license the use of this image in a commercial production.

*On Davis v. Gap, Inc.*, 246 F.3d 152, 166 n.5 (2nd Cir. 2001). Considering that Safeway's use of Jordan's persona was arguably minor in comparison to how Jordan's persona is used in his typical endorsements, Fort's chosen methodology is—according to case law—an effective means of establishing a fair market value that remains tied to the facts at issue and avoids unfairly compensating Jordan for the "highest use" of his publicity rights.

---

[6] Jordan cites to *Mattel, Inc. v. MGA Entm't, Inc.*, 2011 WL 836418 (C.D. Cal. Mar. 4, 2011) for its proposition that the *Georgia–Pacific* hypothetical-negotiation methodology has been rejected for determining the "actual market value" of a copyright license. This argument is unavailing. First, *Mattel* is a non-binding opinion that does not involve a right-of-publicity claim. Second, *Mattel* is factually distinguishable, as it dealt with actual damages for a trade-secret violation involving competitors who were fighting over rights to a highly-lucrative toy brand, where the copyright violation was tangential to the lost profits and unjust enrichment damages claimed by the plaintiff. Moreover, *Mattel* purported to apply *On Davis v. Gap, Inc.*, 246 F.3d 152 (2nd Cir. 2001), which noted that "[t]he decisions of this and other courts support the view that the owner's actual damages may include in appropriate cases the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer," *id.* at 167, and in no way rejected the *Georgia–Pacific* framework. Instead, *On Davis* is best understood as rejecting undue speculation in estimating actual damages in intellectual property cases. *See, e.g.*, *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 567 (7th Cir. 2003) (applying *On Davis*). The scant legal analysis in *Mattel* is insufficient to dissuade the Court from its analysis here.

### iii. Whether Fort's Methodology Is Reliable as Applied Here

Jordan argues in the alternative that even if Fort's methodology is sufficiently reliable, his opinions should nonetheless be excluded because he erred in applying that methodology to the facts of this case. *See* Fed. R. Evid. 702(d) (stating that expert testimony is admissible only if "the expert has reliably applied the principles and methods to the facts of the case"). Jordan says that Fort either considered inappropriate transactions in making his fair-market-value calculation, or that Fort failed to consider certain relevant transactions altogether. In turn, Safeway attacks Jordan's criticism by arguing that objections to an expert's application of a particular methodology go to the weight, not the admissibility, of the expert's testimony.

Jordan does not object to the reliability of the data that Fort considered, but rather to Fort's selection of certain data points at the exclusion of others. Fort is, however, entitled to consider all of the data points presented to him. *See* Fed. R. Evid. 703 ("The facts or data in a particular case upon which an expert bases his opinion or inference may be those perceived by or made known to the expert at or before the hearing."); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 789-90 (7th Cir. 2000). And objections as to whether an expert considered certain factors that the opposing side deems irrelevant generally go to the weight of the expert's opinion, not its admissibility. *See e.g.*, *Daubert*, 509 U.S. at 596; *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (discussing the omission of variables in a regression analysis); *Lees v. Carthage Coll.*, 714 F.3d 516, 526 (7th Cir. 2013); *NutraSweet*, 227

F.3d at 789; *see* also *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) ("It is not the trial court's role to decide whether an expert's opinion is correct."). Even though in this Court's discretion Jordan's objections are not grounds for excluding Fort's testimony, Jordan is free to attack that testimony via the normal adversarial process of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *see* also *Ortiz v. City of Chicago*, 656 F.3d 523, 526 (7th Cir. 2011) ("The admissibility determination [under Rule 702] is not intended to supplant the adversarial process").

### c. Safeway's Motion to Exclude Jordan's Expert (Zimbalist)

Zimbalist's opinion addresses a narrow issue: what is the fair market value of the use of Jordan's identity in general. His opinion, which sets the fair market value at more than $10 million, is not meant to correspond with Jordan's ultimate damages request to the jury (which his attorneys claim will be closer to $2.5 million). Instead, Zimbalist reviewed Jordan's actual endorsements (regardless of the context or the usage rights awarded in those endorsements) to calculate the market rate for use of Jordan's persona as a whole. In support of this approach, Jordan argues that a licensee's specific use of his persona is not dispositive of the determination, *see Douglass*, 769 F.2d at 1138 ("an important aspect of the 'right of publicity' is being able to control the place as well as time and number of one's public appearances"), and that the jury is free to consider the minor extent of the misappropriation and grant an award less than the fair market value if it so

chooses. Safeway's objection, and the basis of its *Daubert* motion, is that Zimbalist improperly considered non-comparable licenses in calculating fair market value, rendering his opinion unreliable. Tangentially, Safeway argues that an opinion that only speaks to Jordan's fair market value in general (as opposed to the fair market value for comparable uses) is irrelevant and not useful to the trier of fact, and should be excluded on that basis.

### i. Whether Zimbalist's Testimony is Reliable

Here, there exists a discrete set of potentially-relevant data points available to the experts, including Jordan's past endorsements, licenses, cease-and-desist letters, and (at least in Fort's eyes), Safeway's past advertising agreements. Both experts engaged in the same general methodology for assessing damages (*i.e.*, fair market value), but through different approaches whereby each expert highlighted certain data points over others. The Court has already declined to exclude Fort's hypothetical-negotiation approach, and Zimbalist's approach of measuring fair market value by examining evidence of prior, arms-length agreements in which Jordan has licensed the use of his identity to willing buyers is no more objectionable. Instead, Safeway's objections—much like Jordan's objections—focus more on Zimbalist's selection of data points in reaching his ultimate conclusion. While Safeway's argument takes several forms (*e.g.*, that Zimbalist improperly assumed that Jordan does not license his rights *a la carte*, that Zimbalist considers intrinsic value in calculating the value of certain licenses considered in his opinion, and that Zimbalist excludes any consideration of Safeway's perspective), the thrust

of each argument is simply a disagreement over the weight or evidentiary value of certain transactions within the finite set of agreements being considered. In that regard, the parties have lodged identical, reciprocal objections against each other. Because the Court has given its imprimatur to Fort's selection of comparable transactions, Zimbalist is also entitled to consider all of the data points presented to him in making his calculation, *see* Fed. R. Evid. 703, and Safeway's objections to Zimbalist's selection process will go to the weight of his testimony, not its admissibility. *Daubert*, 509 U.S. at 596.

### ii. Whether Zimbalist's Testimony Is Relevant to the Trier of Fact

As with any expert, the Court must decide whether Zimbalist's testimony will assist the trier of fact to understand the evidence or to determine a fact at issue. Fed. R. Evid. 702. Here, Jordan first notes the parties' agreement that the proper measure of damages here is the fair market value of the use of Jordan's identity. Second, Jordan's expert, Zimbalist, offered an opinion regarding the full fair market value of Jordan's identity, yet Jordan claims that he does not intend to seek the full value of the use of his identity as damages. Instead, he is only seeking to recover a quarter of that value.

Clearly, if Jordan feels that he is entitled to the full fair market value of Safeway's misappropriation of his identity, it is curious why Jordan only intends to ask the jury for a small percentage of what he is allegedly owed (*i.e.*, something *other than* the fair market value), and even more curious how Jordan determined that 25 percent of the fair market value is the appropriate measure here. Whether

this deduction is, in fact, intended to be a reduction based on Safeway's limited use of Jordan's identity is not exactly clear from the record.

Regardless, the Court is persuaded that Zimbalist's opinion on Jordan's fair market value is of sufficient evidentiary value to warrant its inclusion at trial. The evidence of Jordan's potentially-comparable transactions includes endorsements, licenses, cease-and-desist letters, and an array of other pseudo-agreements, and the jury should be able to hear the competing conclusions of both parties' experts and how those opinions hold up to cross examination. The Court is not in a position to decide which of Jordan's agreements are sufficiently comparable to Safeway's usage. And if, as Zimbalist argues, the only comparable data points are $10+ million agreements, a jury should be entitled to hear that opinion (subject, of course, to cross examination). *See Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

In the end, this is not overly complex material, and a jury will be more than capable of deducing an appropriate damages award amidst these conflicting opinions. Thus, both *Daubert* motions are denied.

## IV.  Pending Motions *in Limine*

### a.  Plaintiff's motion to exclude evidence of cease and desist letters [205]

In this motion, Plaintiff moved to exclude "evidence of cease and desist letters sent by Mr. Jordan's attorney to third parties using Mr. Jordan's identity without his authorization."  [205] at 1.  This motion is denied.

### b.  Plaintiff's motion to exclude evidence of what Defendants would have paid to use his identity [206]

In this motion, Plaintiff moved to exclude "evidence of what defendants would have been willing to pay to use Mr. Jordan's identity in their *Sports Illustrated Presents* advertisement."  [206] at 1.  This motion is granted in part and denied in part as follows:

- To the extent Defendants intend to introduce evidence or testimony about what they subjectively would have been willing to pay to use Jordan's identity, that evidence is barred.

- To the extent Defendants intend to introduce evidence or testimony regarding prior similar transactions in order to show what they would have paid for a similar use of Jordan's identity, that evidence is not barred.

### c.  Defendants' Motion *in Limine* No. 2 [210]

In this motion, Defendants moved to exclude "any testimony, evidence or argument that the use of Jordan's identity pursuant to any license agreement has a fair market value (or intrinsic value) in excess of the compensation for such use stated in the agreement."  [210] at 6.  The motion is granted in part and denied in part as follows:

- The parties may introduce evidence, testimony and argument regarding additional benefits from each given transaction (i.e., free marketing) that Plaintiff knew of and considered in deciding to enter that agreement. The benefits must have been concretely known to Plaintiff at the time he entered the relevant agreement.

- The parties may not introduce evidence, testimony and argument as to the value of those additional benefits to the Plaintiff unless they have specific evidence concretely showing the value of the benefit, and that the specific value was considered by Plaintiff prior to entering the relevant agreement.

- Any evidence, testimony or argument that any given agreement had a fair market value in excess of the express compensation of the agreement must be preceded by concrete evidence showing: (1) a calculation for that excess value based on specific non-speculative evidence; and (2) that Plaintiff knew of that specific excess value prior to entering into the agreement.

### d. Defendants' Motion *in Limine* No. 3 [210]

In this motion, Defendants moved to exclude "any testimony, evidence or argument concerning any amounts or value related to tie-ins to Jordan's other interests, including Nike's Jordan Brand or the Charlotte Bobcats." [210] at 8. The motion is granted in part and denied in part as follows:

- The parties may introduce evidence, testimony and argument regarding amounts or value related to tie-ins to Plaintiff's other interests that Plaintiff contemplated in deciding whether to enter any agreement. These amounts or values must be specific and must have been concretely known to Plaintiff at the time he entered the relevant agreement. They cannot be based on speculation or guesswork.

### e. Defendants' Motion *in Limine* No. 4 [210]

In this motion, Defendants moved to exclude "any testimony, evidence or argument relating to what the NBA or Nike wanted Jordan to do in connection with his various license agreements." [210] at 9. The motion is denied.

26

### f. Defendants' Motion *in Limine* No. 5 [210]

In this motion, Defendants moved that the Court enter an order: (1) "excluding any testimony, evidence or argument concerning punishment, a fine, deterrence, or failure to request Jordan's permission for Defendants' use of his identity," and (2) "permitting the Court or the parties to advise the jury at the onset of the case that the jury's task is not to punish the Defendants but only to determine the fair market value of Defendants' use of Mr. Jordan's identity in the ad." [210] at 11. The motion is granted in part and denied in part as follows:

- The parties may not introduce any testimony, evidence or argument concerning punishment, a fine or deterrence.

- The parties may introduce testimony, evidence or argument regarding the failure to request Plaintiff's permission to use his identity.

- Regarding subpart (2), the motion is denied. The Court will, however, consider such an instruction when compiling its jury instructions. This issue will be addressed at the final pretrial conference.

### g. Defendants' Motion *in Limine* No. 7 [210]

In this motion, Defendants moved to exclude "any testimony, evidence or argument concerning after-the-fact success of the companies with which Jordan has contracted for use of his identity." [210] at 13. The motion is denied at this time. However, the Court will consider objections in this regard at trial.

### h. Defendants' Motion *in Limine* No. 10 [210]

In this motion, Defendants moved to exclude "any testimony, evidence or argument referencing how much Sirius XM or any other licensee spent on their

advertisements (or otherwise exploited Plaintiff's likeness)." [210] at 17. The motion is granted in part and denied in part as follows:

- The parties may introduce testimony, evidence or argument referencing amounts spent by Sirius XM or any other licensee on their advertisements only if there is evidence showing that the amount was known to Plaintiff at the time he entered into the contract with that licensee. No other reference to those amounts will be allowed.

### i. Defendants' Motion *in Limine* No. 11 [210]

In this motion, Defendants moved to exclude "any testimony, evidence or argument referencing post-contract or extra-contractual benefits Mr. Jordan or any of his licensees received, or successes they achieved." [210] at 18. This motion is granted in part and denied in part as followed:

- The parties may introduce evidence, testimony and argument regarding post-contract or extra-contractual benefits or successes only if those benefits or successes were concretely known and considered by Plaintiff prior to entering into the license, agreement or contract. To the degree the benefits or successes were generally expected or speculatively hoped for, without support from specific evidence showing that Plaintiff knew with certainty that they would be achieved, evidence, testimony and argument regarding those benefits and successes is barred.

### j. Defendants' Motion *in Limine* No. 13 [210]

In this motion, Defendants moved to bar "Plaintiff from presenting David Falk as a witness at trial." [210] at 25. The motion is denied, but the Defendants may object at trial if Mr. Falk's testimony is in actuality expert testimony under F.R.E. 702.

### k. Defendants' Motion *in Limine* No. 15 [210]

In this motion, Defendants moved to exclude "any testimony, evidence or argument that Mr. Jordan would not have entered into any deal with Defendants." [210] at 25. The motion is denied.

### l. Defendants' Motion *in Limine* No. 1 [211]

In this motion, Defendants moved to exclude "incomparable and pre-2003 agreements, accounting ledgers relating to those agreements and settlement agreements that plaintiff, Michael Jordan ("Jordan"), intends to introduce into evidence to support his damage claim." [211] at 1.[7] The motion is denied.

## V. Previously Decided Motions *in Limine*

At the May 19, 2015 motion hearing, the Court heard argument and ruled on several of the parties' motions *in limine*. For ease of reference at trial, the Court reiterates those rulings here. This is purely for ease of reference, and in no way alters the Court's prior decisions regarding these motions.

### a. Plaintiff's motion to exclude evidence of what Defendants have paid other people for the use of their identities [207]

In docket entry 207, Plaintiff moved to "exclude evidence of what defendants have paid other people for the use of their identities." On May 19, 2015, the Court ruled as follows: "Plaintiff's Motion to exclude evidence of what Defendants have paid other people for the use of their identities [207] is granted by consent with

---

[7] A comprehensive list of documents that are the subject of this motion are set forth at [211-1].

regard to the three individuals mentioned in Court: Dr. Dean Ornish, Debbie Lily and Chef Marcella Valladolid." [311].

### b. Defendants' Motion *in Limine* No. 6 [210]

In their Motion *in Limine* No. 6, the Defendants moved to exclude "any testimony, evidence or argument regarding tarnishment of Jordan, his image or his brand." [210] at 12. That motion was granted by the consent or agreement of the parties. [311].

### c. Defendants' Motions *in Limine* No. 8 [210]

In their Motion *in Limine* No. 8, the Defendants moved to exclude "any testimony, evidence, or argument concerning endorsement of, affiliation with, or any reference to steak (whether in Jordan's steak-related businesses or offerings or otherwise). [210] at 15. That motion was denied. [311].

### d. Defendants' Motions *in Limine* No. 9 [210]

In their Motion *in Limine* No. 9, the Defendants moved to exclude "any testimony, evidence or argument referring to trademark infringement or any reference to something as a trademark." [210] at 16. That motion was granted by the consent or agreement of the parties. [311].

### e. Defendants' Motions *in Limine* No. 14 [210]

In their Motion *in Limine* No. 14, the Defendants moved to exclude "any testimony, evidence or argument of Mr. Jordan's emotional distress (including his reaction to or disappointment with Defendants' use of his identity)." [210] at 25. That motion was granted by the consent or agreement of the parties. [311]

## VI.    Conclusion

For the foregoing reasons, the Court denies Plaintiff's Motion to Exclude Opinion of Rodney Fort [281] and Defendants' Motion *in Limine* No. 12 to Exclude the Testimony of Andrew Zimbalist [278].  The remaining motions *in Limine* are granted and denied as explained above.  To the degree any evidence or argument has been barred by this Court's Order, it is excluded at trial unless the parties first obtain leave of Court pursuant to a request outside the presence of the jury that establishes admissibility under the Federal Rules of Evidence.

Dated:        July 23, 2015

_____

John Robert Blakey
United States District Judge